```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                              :
UNITED STATES OF AMERICA,                     :
                              Plaintiff,      :    24 Cr. 153 (LGS)
                                              :
              -against-                       :    OPINION & ORDER
                                              :
JOHN ARTHUR HANRATTY,                         :
                              Defendant.      :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

Defendant John Arthur Hanratty seeks (1) dismissal of the Indictment based on asserted violations of his Fifth Amendment right not to incriminate himself, (2) a hearing pursuant to *United States v. Monsanto*, 491 U.S. 600 (1989), and/or vacatur of an *ex parte* post-indictment restraining order ("PIRO") and (3) a bill of particulars. For the following reasons, the motion for a *Monsanto* hearing is granted. The motion for a bill of particulars is granted in part. Defendant's applications are otherwise denied.

I.  **BACKGROUND**

The facts below, unless otherwise specified, are taken from the Superseding Indictment, the Complaint and the parties' sworn submissions.

Defendant Hanratty owns and manages an investment firm, Ebury Street Capital LLC ("Ebury Capital"). Ebury Capital invests in tax liens and distressed real estate. Ebury Capital manages Ebury Fund 1 LP ("Fund 1") and Ebury Fund 2 LP ("Fund 2").

In 2017, Ebury Capital obtained two revolving lines of credit totaling $20 million from Emigrant Business Credit Corporation ("EBCC"), secured by municipal tax liens. Defendant provided EBCC with borrowing base certificates ("BBCs"), which are spreadsheets summarizing the value of the collateralized tax liens. By December 2019, Ebury Capital had nearly exhausted

the lines of credit, and by November 2021, Ebury Capital owed EBCC over $18 million in outstanding principal and interest.

The Government began its investigation leading to the instant charges in April 2022, when EBCC alleged to the Government that Hanratty had defrauded EBCC in connection with the lines of credit and collateral.

On September 25, 2022, EBCC filed a civil suit against Defendant, Ebury Capital, Fund 1, Fund 2 and other Ebury-affiliated entities in New York state court (the "Civil Case"). The parties in the Civil Case conducted discovery, including document production and depositions. After EBCC filed the Civil Case, it shared with the Government duplicates of the BBCs that it had produced before, as well as deposition transcripts obtained during discovery. In January 2024, the Civil Case was stayed on Defendant's motion due to the pending criminal action against Defendant. *Emigrant Business Credit Corp. v. Hanratty*, No. 158207/2022, 2024 WL 289517, at *2 (N.Y. Sup. Ct. Jan. 25, 2024).

On December 15, 2023, the Government filed the criminal Complaint, which led to Defendant's surrender and arrest on December 21, 2023. On March 18, 2024, the Government filed the Indictment, in which the grand jury charged Defendant with one count of wire fraud, one count of bank fraud and two counts of engaging in a monetary transaction in property derived from the bank and wire fraud. On March 25, 2024, the Government obtained a PIRO to restrain all assets subject to forfeiture owned or controlled by Defendant, including "any and all assets held by [Fund 1 and Fund 2], including municipal tax liens and real estate."

On July 1, 2024, Defendant filed a motion to dismiss the Indictment, seeking relief from the PIRO and seeking a bill of particulars. On August 26, 2024, the Government filed a Superseding Indictment, rendering moot Defendant's first argument for dismissal. On

September 4, 2024, the Court agreed to Defendant's request to apply his motion to dismiss to the Superseding Indictment, except for the now-moot first argument, because of the Defendant's lack of funds to pay defense counsel. At the Court's request, on October 30 and November 5, 2024, the parties filed supplemental briefing, and the Government filed an affidavit of an FBI agent involved in the investigation.

## II.   DISCUSSION

### A.   Defendant's Motion to Dismiss

Defendant moves for dismissal of the Superseding Indictment because it is the product of information obtained by the Government from Defendant under compulsion in the Civil Case, in violation of Defendant's Fifth Amendment right against self-incrimination.[1] Defendant's motion to dismiss the Superseding Indictment is denied because the evidence does not support a finding that Defendant's document production and deposition testimony in the Civil Case were (1) compelled (2) by governmental action, both of which are necessary for a violation of the Fifth Amendment. *Salinas v. Texas*, 570 U.S. 178, 184 (2013) (explaining that failure to assert the Fifth Amendment privilege waives it unless "governmental coercion makes [the individual's] forfeiture of the privilege involuntary").

#### 1.   State Action

The challenged conduct does not constitute state action because the record evidence shows that EBCC's conduct in obtaining information from Defendant in the Civil Case was not attributable to the Government, a necessary element to trigger Fifth Amendment protection.

---

[1] Defendant also alleged a violation of his Fourth Amendment due process rights on the same basis, but his reply memorandum of law and supplemental letter brief confine his arguments to the Fifth Amendment.

"[T]he United States Constitution regulates only the Government, not private parties." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020).[2] A private party's conduct is attributable to the government only "where there is a sufficiently close nexus between the State and the challenged action of the regulated entity." *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 161 (2d Cir. 2002) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). "A nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *United States v. Stein*, 541 F.3d 130, 147 (2d Cir. 2008) (emphasis omitted); *accord United States v. Connolly*, No. 16 Cr. 0370, 2019 WL 2120523, at *12-13 (S.D.N.Y. May 2, 2019). Private conduct is not deemed state action when the Government "merely approves or acquiesces in the initiatives of the private party." *Stein*, 541 F.3d at 146; *accord Cunningham v. CVS Health Corp.*, No. 23 Civ. 1328, 2024 WL 2867303, at *13 (S.D.N.Y. June 4, 2024); *cf. Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 615 (1989) (finding state action where "the Government did more than adopt a passive position toward the underlying private conduct" and "made plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions").

The Government did not coerce EBCC to bring the Civil Case or seek civil discovery. Unlike the cases in which the private party is a potential defendant cooperating with the

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

4

Government under threat of indictment, EBCC here was the victim with independent motives for aiding the Government. This case is unlike *Stein*, in which the Second Circuit found state action "because the government forced KPMG to adopt its constricted Fees Policy," which conditioned the payment of employees' legal fees on their cooperation with the Government. 541 F.3d at 148 (finding a violation of the Sixth Amendment due process right of an individual criminal defendant to access available resources for their defense); *see also Connolly*, 2019 WL 2120523, at *12-13 (finding state action where Deutsche Bank, under threat of indictment, elicited statements from a criminal defendant during the bank's internal investigation, which was significantly controlled by the Government). Even in *Gilman v. Marsh & McLennan Cos.*, where the company was under the threat of indictment, the Second Circuit found no state action where company had sought to interview two employees whose conduct had given rise to the criminal allegations, but where the Government had not forced or demanded the interviews, nor framed their nature and scope. 826 F.3d 69, 76 (2d Cir. 2016). The court in *Gilman* distinguished *Stein* for the additional reason that KPMG had no institutional interest in stripping its employees of their chosen defense counsel, while in *Gilman* the company had reason to conduct the two interviews because the company's stock price was sinking and many of the company's constituencies were demanding answers about the criminal allegations. *Id*. at 76-77. In the instant case, the Government had no coercive power over EBCC, which was the victim of Defendant's alleged fraud, not a target of the Government criminal investigation. EBCC had its own institutional interest in pursuing the civil case -- to recoup the money it was owed. These circumstances support a finding that EBCCs conduct in the Civil Case was private conduct and not state action.

The Government did not manage or control EBCC in the Civil Case, nor were the Civil Case and the Government investigation a "joint activity." *Stein*, 541 F.3d at 147. The Government did not ask EBCC to obtain any information via interrogatories or depositions and did not provide lists of deposition questions. To the extent that the Government received information from EBCC, the evidence does not support that EBCC's discovery in the Civil Case -- beyond what EBCC already knew or possessed -- materially contributed to the Government's investigation. EBCC's presentation to the Government and EBCC's production of subpoenaed documents were not the fruits of civil discovery since they preceded the Civil Case. The Government obtained Ebury's borrowing base certificates from EBCC after the Civil Case was filed, but they had been previously produced. The Government obtained from EBCC Defendant's deposition transcripts from the Civil Case, but they did not give rise to any additional investigative leads. The timing of the Government's arrest of Defendant near the conclusion of discovery in the Civil Case may suggest that the Government wanted to maximize its receipt of any useful information from the case, but the record does not show that the Government was anything more than a passive recipient. That EBCC was eager to cooperate with the Government does not convert EBCC's conduct in the Civil Case into joint activity or state action.

Defendant raises several facts meant to serve as circumstantial evidence of state action. However, even together they are insufficient to support a reasonable inference that the Government and EBCC were working together in conducting the Civil Case. (1) Defendant asserts that, by March 2022, EBCC had hired counsel to investigate the Defendant's alleged fraud but did not share that fact with EBCC's bankruptcy counsel, who was in communication with Defendant. A reasonable inference is that EBCC did not want to disclose its investigation to

6

Defendant, but the reasons could easily have related to the integrity of evidence or the prospect of reaching an acceptable settlement with Defendant.  (2) Defendant points out that after EBCC's presentation to prosecutors, they subpoenaed EBCC instead of Defendant or his company.  The most reasonable explanation is that the prosecutors did not want violate the Fifth Amendment rights of the target of their investigation.  (3) Defendant observes that EBCC brought "$21 million and counting claims" in the Civil Case, even after Defendant had acknowledged his debt and promised to "fulfill a heavily-negotiated $18 million repayment plan."  However, it appears from the Civil Case that EBCC never agreed to the repayment plan and hoped to recover more of its loss and on better terms than what Defendant had proposed.  (4) Defendant quotes from the firm website about the criminal law experience of EBCC's lead counsel in the Civil Case, but omits that "[h]e serves as lead counsel in a variety of civil lawsuits and trial matters." https://www.sullcrom.com/Lawyers/Alexander-J-Willscher, last visited November 26, 2024.  (5) Regarding Defendant's implication that EBCC violated the Civil Case confidentiality agreement in providing deposition transcripts to the Government, the Government attests that it received the transcripts after the presumptive confidentiality period, that portions of the transcripts were subsequently posted on the civil docket and that the Government developed no investigative leads from the transcripts, (6) Defendant argues that "it seems likely that the **only** reason why EBCC [on December 18, 2023, revised its proposed date for filing its summary judgment motion from December 22, 2023, to January 12, 2024] was to remove all fraud arguments from its summary judgment brief" and proceed only on the breach of contract claim for reasons relating to the prosecution in this case. (Emphasis in original.)  But it seems just as likely that EEBC's defense counsel (1) even from the beginning, strategized that summary judgment was more likely to be achieved on a failure-to-pay contract claim than a fraud claim, which by its nature

7

raises issues of fact and (2) by December 18, 2023, between Chanukah and Christmas, realized that more time was needed to get client comments and complete briefing. Even crediting what Defendant seems to imply, none of it says anything about the Government's involvement in the Civil Case, but instead suggests that EBCC was aggressively pursuing its options in its roles as civil litigant and cooperator. The law requires much more to recast a private litigant's conduct in a civil lawsuit as state action constrained by the Constitution.

### 2. Compelled Testimony

Defendant also fails to show compulsion, a necessary element of showing that he was deprived of his Fifth Amendment right not to incriminate himself. A witness who does not affirmatively assert the privilege against self-incrimination loses it unless "the particular disclosure was 'compelled' within the meaning of the Fifth Amendment." *Minnesota v. Murphy*, 465 U.S. 420, 428 (1984). Compulsion occurs when the witness was denied "a free choice to admit, to deny, or to refuse to answer." *Salinas*, 570 U.S. at 185. Defendant was not under compulsion to provide information in the Civil Case because he was free to invoke the privilege and refuse to be deposed or produce documents, but Defendant did not do so.

An individual is not subject to compulsion under the Fifth Amendment because of the liability he would face if he refused to provide discovery in the Civil Case. *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) ("[I]f civil defendants do not elect to assert their Fifth Amendment privilege, and instead fully cooperate with discovery, their testimony in their defense in the civil action is likely to constitute admissions of criminal conduct in their criminal prosecution."). The Court has not found, and Defendant has not cited, any authority where the Defendant provided civil discovery, did not invoke his Fifth Amendment privilege, and was later found to have suffered a violation of his Fifth Amendment right.

Numerous cases illustrate that civil litigants have invoked their Fifth Amendment privilege even when the consequence was a default judgment in the civil action. *See, e.g.*, *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 448 (2d Cir. 2013) (upholding default judgment granting injunctive relief and $1.25 million of statutory damages against the defendant who invoked the Fifth Amendment privilege); *Parlin Funds LLC v. Gilliams*, No. 11 Civ. 2534, 2012 WL 5265554, at *2 (S.D.N.Y. June 15, 2012), *report and recommendation adopted*, No. 11 Civ. 2534, 2012 WL 5258984 (S.D.N.Y. Oct. 23, 2012).

Defendant's motion to dismiss is denied because the Indictment was not the product of information obtained by the Government from Defendant under compulsion in the Civil Case in violation of Defendant's Fifth Amendment right against self-incrimination.

3. **Defendant's Request for Governmental Communications**

In the alternative, Defendant seeks production of "all materials relevant to" the communications between the Government and EBCC or EBCC's counsel, including all internal investigation documents. The request, which is made in a single sentence without elaboration or legal authority, is denied. First, Defendant has not shown that such discovery is likely to be productive in the face of the Government's submission of the FBI Agent's affidavit stating under oath that to her knowledge "at no point has the FBI or the U.S. Attorney's Office asked [EBCC] to obtain any information from [Defendant] or [Ebury Capital] via civil interrogatories or depositions. To my knowledge, at no point has the FBI or the U.S. Attorney's Office provided lists of questions for EBCC's lawyers to pose to [Defendant] or any other witnesses . . . ." Second, even if additional discovery somehow warranted a finding of state action, the motion to dismiss would be denied on the independent ground that Defendant's testimony in the Civil Action was not compelled for purpose of the Fifth Amendment.

9

B.     **Defendant's Request for a Probable Cause Hearing or Vacatur of the PIRO**

Defendant seeks a probable cause hearing pursuant to *United States v. Monsanto*, 491 U.S. 600 (1989), on the basis that the PIRO freezing all of the assets of Fund 1 and Fund 2 violates his Sixth Amendment right to counsel and his Fifth Amendment right to due process because the assets are not properly restrained and are needed to pay Defendant's criminal defense. In the alternative, Defendant asks the Court to exercise its equitable power to vacate the PIRO to allow the bankruptcy court to oversee the liquidation of Ebury's business in a way that will best preserve money for its creditors. For the following reasons, Defendant's request for a *Monsanto* hearing is granted. The motion to vacate is reserved pending the hearing.

1.     **Requirements for a *Monsanto* hearing**

The Government may obtain a PIRO over a Defendant's property or property he controls if it "would, in the event of conviction, be subject to forfeiture." 21 U.S.C. § 853(e)(1)(A); *see* 18 U.S.C. § 982(b)(1) ("The forfeiture of property under this section [related to money-laundering offenses], including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by [21 U.S.C. § 853]."); *United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015) (describing the statutory framework). As in this case, the Government typically obtains a PIRO in an *ex parte* application upon a showing of probable cause. *See* 21 U.S.C. § 853(e)(1)(A) (authorizing courts to enter a PIRO upon application of the Government and filing of an indictment); *Monsanto*, 491 U.S. at 615 (upholding *ex parte* PIROs based on a finding of probable cause).

When a PIRO implicates criminal defendant's Sixth Amendment right to counsel, the Supreme Court permits the defendant to request an evidentiary hearing to challenge whether probable cause exists to believe that "the assets in dispute are traceable or otherwise sufficiently

10

related to the crime charged," i.e., that the assets are forfeitable upon conviction. *Kaley v. United States*, 571 U.S. 320, 324, 327 (2014). To warrant a hearing, the defendant must "make a sufficient evidentiary showing that there are no sufficient alternative, unrestrained assets to fund counsel of choice." *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013). The defendant need not "make a formal *prima facie* showing that the funds were illegitimately restrained . . . beyond providing a basis for bringing a motion for a *Monsanto* or *Monsanto*-like hearing in the moving papers." *Id.*

At the hearing, the Government "bear[s] the relatively modest burden of demonstrating probable cause to believe the assets are properly forfeitable." *Id*. Because "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice," *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989), a PIRO supported by probable cause of forfeitability is constitutionally permissible, *Kaley*, 571 U.S. at 324. The defendant is not entitled to a hearing to second guess the grand jury's finding of probable cause to believe that the defendant committed the crime alleged. *Id.* at 340-41.

Defendant here has satisfied both requirements for a hearing, showing both insufficient alternative assets and a basis for the motion seeking a hearing.

2. **No Sufficient Alternative Assets**

Defendant has made an evidentiary showing that, apart from assets of Fund 1 and/or Fund 2, "there are no sufficient alternative, unrestrained assets to fund counsel of choice." *Bonventre*, 720 F.3d at 131. Fund 1 and Fund 2 are both limited partnerships controlled by their general partner, Ebury Capital, which is 100% owned by Defendant. Fund 1 and Fund 2's Limited Partnership Agreements require the entities to advance reasonable attorneys' fees for

11

Defendant's defense of any action arising from his work for Ebury Capital. This obligation may warrant a release of funds from Fund 1 and Fund 2, even though both Funds are now Debtors in a bankruptcy proceeding captioned *In Re Ebury Street Capital, LLC*, No. 24-10499-BPC, ECF No. 7 (Bankr. M.D. Ala. May 14, 2024). *See In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 377, 396 (Bankr. S.D.N.Y. 2005) (allowing advances out of the bankruptcy estate to pay for defense costs of officers entitled to obligatory indemnification).

Defendant has made a sufficient evidentiary showing of no alternative funds. His declaration states: Defendant is married, has three minor children and is his family's sole breadwinner. Ebury had been his primary business and income source for the past decade, but has not paid him compensation since November 2023, and has not paid him anything since his last advance of retainer payments for criminal counsel in December 2023. He has no home, car, bank account, brokerage or retirement account. Defendant is selling his possessions, moving back in with his parents and living off an $80,000 loan against his whole life insurance policy, against which he paid only $100,000. As of July 1, 2024, Ebury Capital and Defendant owed their counsel $358,924.75, comprising $269,404.71 for this criminal case and the remainder for the Civil Case and a parallel SEC investigation. Defense counsel's declaration states that they cannot afford to keep representing Defendant without payment. The Government's arguments for a more detailed showing are unpersuasive because Defendant has provided unequivocal statements about his own financial situation rather than specifics of dollar estimates of Ebury's assets, which allegedly were inconsistent in the past, and because Defendant's sale of EBCC's collateral is irrelevant because whatever amounts remain in Fund 1 and Fund 2 are now subject to the PIRO.

### 3. A Basis for a Probable Cause Hearing

Defendant has sufficiently shown a "basis" for his motion seeking a *Monsanto* hearing and need not "make a formal prima facie showing." *Bonventre*, 720 F.3d at 131. Defendant has raised a question whether all of the assets of Fund 1 and Fund 2 were "involved in" the two § 1957 transactions charged in the Indictment. Courts are entitled to pre-trial restraint of assets subject to probable forfeiture. *See* 18 U.S.C. § 982 ("[A]ny property, real or personal, involved in [a violation of 18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture); 21 U.S.C. § 853(e) (discussing standard for protective orders).

The Government asserts that all of the assets of Fund 1 and Fund 2 are properly restrained because both entities were used as a conduit for, and therefore "involved in," money laundering. The Government states, "it is well established that the Government can 'forfeit a business entity which is used to facilitate the offense of money laundering,'" quoting a 2011 decision from this District, which quotes in turn a 1992 case from the Eastern District of Virginia. The Government has relied exclusively on money laundering as the basis for the PIRO since it first applied for the PIRO and in opposition to the instant motion. While the Affidavit in support of the PIRO application asserts in summary fashion that the Fund 1 and Fund 2 assets are "traceable" to proceeds of the alleged mail and wire fraud, and therefore forfeitable under 18 U.S.C. § 982(a)(2)(A), the Government has never pursued that theory. Nevertheless, the Government's PIRO application describes at length the alleged course of conduct and "numerous examples" underlying the bank fraud and wire fraud counts, only a small portion of which corresponds to the two, narrow money laundering charges.

Defendant is charged with money laundering in Counts Three and Four of the Superseding Indictment, mirroring charges in the original Indictment, which preceded the PIRO

13

application. Both counts charge a violation of 18 U.S.C. § 1957, engaging in a monetary transaction in property derived from specified unlawful activity, namely the transfer of proceeds from the wire and bank fraud charged in Counts One and Two. Despite the breadth of Counts One and Two, which span from 2017 to 2021, the two money laundering counts are narrowly drawn. Each count alleges a single transaction, only one of which is described in the PIRO application.

Count Three alleges a single transaction on May 17, 2019, in which Defendant caused the transfer of approximately $860,000. The affidavit in support of the PIRO application explains that on May 17, 2019, EBCC transferred $860,000 to Fund 1 on Ebury Capital's revolving credit line based on an allegedly fraudulent spreadsheet from Defendant to EBCC. Defendant and Ebury Capital then used the $860,000 to pay a portion of a "settlement" to an Ebury Capital investor, which violated Ebury Capital's agreement with EBCC about the permissible use borrowed funds.

Count Four similarly alleges a single transaction on January 13, 2020, in which Defendant caused the transfer of "at least $60,000." But the PIRO application describes no transaction on January 13, 2020, or for "at least $60,000," though it does describe a transfer from EBCC to Fund 2 of "approximately $125,000" "on or about January 10, 2020" based on a fraudulent spreadsheet.

Even assuming that this latter transaction is the basis for Count Four, it seems a stretch to say that all of the assets of Fund 1 and Fund 2 -- which in October 2024 were said to be approximately $24 million, *see In Re Ebury Street Capital, LLC*, No. 24-10499-BPC, ECF Nos. 209, 213 (Bankr. M.D. Ala. October 25, 2024) -- are forfeitable because they were used to facilitate two transactions that together amount to less than $1 million. The Government argues

14

that Fund 1 and Fund 2 were "conduits" and "front" for Defendant's "Ponzi-like scheme." But this characterization does not accord with the limited money laundering charges in the Superseding Indictment. A hearing is needed on both the law and the facts to determine whether probable cause exists to believe that all of the assets of Fund 1 and Fund 2 are sufficiently related to the money laundering crimes charged as to be forfeitable upon conviction. *See Kaley*, 571 U.S. at 324, 327.

Defendant's request for this Court to exercise its equitable power to vacate the PIRO to allow for the bankruptcy court liquidation of bankruptcy estate is held in abeyance pending the *Monsanto* hearing.[3]

### C.     Defendant's Request for a Bill of Particulars

Defendant moves for a bill of particulars that identifies Defendant's allegedly fraudulent acts. The motion is granted to the extent that the Government shall identify all the liens in the final BBCs that it will seek to prove were misrepresented by Defendant to EBCC.

Under Federal Rule of Criminal Procedure 7(f), a court "may direct the government to file a bill of particulars." "A bill of particulars enables a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010). A bill of particulars "is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004); *accord United States v. Ferryman*, No. 23 Cr. 117, 2023 WL 6622233, at *3

---

[3] At the appropriate time, the Court would appreciate clarification whether the bankruptcy case is proceeding under Chapter 7 (liquidation) or Chapter 11(reorganization) of the Bankruptcy Code, and whether EBCC is in effect avoiding the bankruptcy statutory scheme for distribution or reorganization.

15

(S.D.N.Y. Oct. 11, 2023). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

In cases involving fraud, courts have required the Government to specify through a bill of particulars which documents or transactions it intends to prove are fraudulent if this information is not ascertainable. *See, e.g.*, *United States v. Wang*, No. 23 Cr. 118-3, 2024 WL 1251105, at *4 (S.D.N.Y. Mar. 22, 2024) (granting defendant's requests for a bill of particular in part as to "which wire transfers the [g]overnment alleges are illegal"); *United States v. Vaid*, No. 16 Cr. 763, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (granting defendants' motions for a bill of particulars in part as to "which insurance claims were false"). Otherwise, in effect, "the burden of proof impermissibly [may] shift[ ]" to the defendant to prove the documents or transactions are not fraudulent. *Bortnovsky*, 820 F.2d at 575. "Whether to grant a bill of particulars is generally a decision entrusted to the sound discretion of the district court." *Ramirez*, 609 F.3d at 502. Nevertheless, in *Bortnovsky*, the Second Circuit held that the district court had erred in failing to grant a bill of particulars to identify three fraudulent documents and the dates of fake burglaries in an insurance fraud case. 820 F.2d at 574. The Court noted that the production of over 4,000 documents did not negate need for bill of particulars because defense counsel was "left unguided as to which documents would be proven falsified." *Id*. at 575; *accord United States v. Tournant*, No. 22 Cr. 276, 2023 WL 8649893, at *2 (S.D.N.Y. Dec. 13, 2023).

Defendant's motion for a bill of particulars is aimed at the wire fraud charge. That charge in Count One contains only the following description of the alleged fraud:

> From at least in or about 2017 through a least in or about 2021, [the Defendant], in the course of soliciting funds from a commercial line of credit and investments

>on behalf of his tax-lien investment firm (the "Investment Firm"), engaged in a scheme to make false statements to victims, including a specialty finance company ("Victim Company-1") that is a wholly owned subsidiary of a bank insured by the [FDIC] ("Victim Bank-1") and various Investment Firm investors, regarding liens owned by the Investment Firm and the disposition of the victims funds . . . ."

At the request of defense counsel, the Government provided additional information in an email exchange in May 2024. The Government described in general terms the nature of the fraudulent statements and provided a handful of examples, including those listed in the Complaint, but declined to identify "all statements, acts, and/or omissions that form the basis of the Indictment's bank and wire fraud charges."

The Government's general description is insufficient to allow Defendant to prepare for trial and prevent surprise. *See Ramirez*, 609 F.3d at 503. The Government's email states that the charges of false statements to EBCC "are primarily based on false [BBCs] that defendant caused to be submitted to the bank in connection with commercial lines of credit." Defendant has proffered the January 9, 2020, BBC ("January 2020 BBC") discussed in the Complaint as illustrative. The January 2020 BBC is an Excel workbook that comprises twenty-one spreadsheets. Ten of these spreadsheets list assets that Ebury purported to own, a total of 1,004 assets. The Government alleges that one spreadsheet -- called "NJ Additions" -- lists forty-four assets that Ebury did not own. It is unknown which assets, if any, on the other spreadsheets are alleged to be misrepresented. There are approximately forty final BBCs during the period covered by the Superseding Indictment. If the January 2020 BBC is representative, the forty BBCs may contain over 40,000 assets for Defendant to sift through. "The Government [does] not fulfill its obligation merely by providing mountains of documents to defense counsel who [a]re left unguided as to which documents would be proven falsified." *Bortnovsky*, 820 F.2d at 575.

The Government argues that it need not particularize its allegations when most of the BBCs are false, as more recent BBCs incorporate misrepresentations in earlier BBCs, and the inclusion of "any improper assets" makes the bottom-line numbers on a BBC inaccurate. While the Government is correct that a bill of particulars is often unwarranted when "most or all activity is alleged to have been illegal," versus where "only isolated illegal activity is alleged," *United States v. Tuzman*, 301 F. Supp. 3d 430, 451 (S.D.N.Y. 2017), the argument is circular in this case. The Government has not substantiated its assertion that most or all of the listed assets are false. Even if the Government intends to focus primarily on the bottom-line sum of numbers as inaccurate, it can do so only by showing that at least a portion of the individual components are inaccurate. Moreover, an incorrect number on a BBC, particularly if based in part on a recurrent misstatement, is not illegal unless the Government can also prove that the misstatement was "material" and made "with fraudulent intent." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). If, hypothetically, in the January 2020 BBC discussed above, only forty-four of the 1,004 asset listings were false, that may undermine a finding of materiality or criminal intent.

The cases on which the Government relies are distinguishable. For example, in *United States v. Rose*, No. 19 Cr. 789, 2021 WL 2117119 (S.D.N.Y. May 24, 2021), "all of the actions of the alleged conspirators were fraudulent; no aspect of the no-fault insurance scheme was legitimate." *Id.* at *15. Despite its assertion, the Government has not shown in this case that the alleged misrepresentations rise to the level where the "entire business" is "permeated and sustained" by fraud, and thus require particularized disclosure. In all three of the cited cases, the Government provided the defendants with more specific information than in the instant case. *See United States v. Dupree*, No. 10 Cr. 627, 2011 WL 5976006, at *7 n.7, 8 (E.D.N.Y. Nov. 29, 2011) (explaining that, a year prior to the defendant's request, the Government had provided "an

18

eight-page exhibit list with Bates numbers and identification of particular invoice numbers, dates and dollar amounts"); *Tuzman*, 301 F. Supp. 3d at 452 (noting that the Government had provided, among others, "a spreadsheet that 'detail[ed] thousands of purchases and sales of" stocks that were presumptively all manipulative); *Rose*, 2021 WL 2117119, at *15 (agreeing with the Government that "the line sheets" it provided "summarizing the relevant text messages and telephone calls allowed counsel to search [for pertinent conversations]" easily "and 'to listen to [an] intercepted call with a single mouse click," making the information sought in a bill of particulars readily ascertainable).

Accordingly, the Government shall provide a bill of particulars identifying each asset listing in the final BBCs that the Government intends to prove was fraudulent. To streamline its disclosure, the Government may consolidate recurring misrepresentations in different BBCs.

The remainder of Defendant's request, including identifying allegedly fraudulent statements, acts or omissions in email, phone calls and other materials, is denied because it impermissibly seeks evidentiary detail or are an attempt to use the bill of particulars as "a general investigative tool." *United States* v. *Martinez*, No. 22 Cr. 251, 2023 WL 2403134, at *1 (S.D.N.Y. Mar. 8, 2023). The Government has represented that it does not possess recordings of Defendant's phone calls and will share summaries of witnesses' recollections of their telephone conversations with Defendant in the 3500 material. Given the information the Government has already provided, the promised Jencks Act disclosure and the forthcoming bill of particulars, Defendant has not shown that the remaining requested information is necessary, rather than merely helpful, to the preparation of his defenses. *Id.*; *see also United States v. Bonventre*, 646 Fed. App'x. 73, 79 (2d Cir. 2016) (summary order) (upholding the denial of a motion for a bill of particulars because "such evidentiary detail is not the function of the bill of particulars").

### III.  CONCLUSION

For the foregoing reasons, Defendant's motion (1) to dismiss the Indictment based on asserted violations of his Fifth Amendment right not to incriminate himself is DENIED, (2) for a hearing pursuant to *United States v. Monsanto*, 491 U.S. 600 (1989), is GRANTED, and/or for vacatur of the post-indictment restraining order is RESERVED and (3) for a bill of particulars is GRANTED in part such that the Government shall provide a bill of particulars identifying each asset listing in the final BBCs that the Government intends to prove was fraudulent and is otherwise DENIED.  The scheduling of the hearing will be addressed in a separate order.

Dated: November 26, 2024
       New York, New York

                                    _____
                                    **LORNA G. SCHOFIELD**
                                    **UNITED STATES DISTRICT JUDGE**