UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA,

          -against-

JOHN ARTHUR HANRATTY,

                          Defendant.

--------------------------------------------------------- X

24 Cr. 153 (LGS)

**ORDER**

LORNA G. SCHOFIELD, District Judge:

WHEREAS, following a trial, a jury found Defendant guilty of one count of wire fraud in violation of 18 U.S.C. § 1343 (Count One), one count of bank fraud in violation of 18 U.S.C. § 1344 (Count Two) and two counts of engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 (Counts Three and Four, respectively). A sentencing hearing is scheduled to take place on May 26, 2026.

WHEREAS, the parties have not agreed on the calculation of the recommended sentence under the United States Sentencing Guidelines (the "Guidelines"). The parties disagree about the Offense Level computation, specifically (i) the appropriate loss amount applicable under § 2B1.1(b)(1) of the Guidelines and (ii) the applicability of a two-point reduction for acceptance of responsibility under § 3E1.1(a) of the Guidelines. The parties did not request a *Fatico* hearing and filed written arguments about the correct Guidelines calculation.

WHEREAS, the Court has reviewed the parties' written submissions and the applicable Guidelines.

WHEREAS, the November 1, 2025, edition of the Guidelines Manual applies in this case. All references to section numbers herein refer to the Guidelines unless otherwise stated.

**Loss Amount Calculation**

WHEREAS, the Court finds that, in committing these offenses, Defendant is responsible for a total loss amount of more than $9.5 million but less than $25 million. Thus, a 20-level increase is added to the Base Offense Level. *See* USSG § 2B1.1(b)(1)(K)-(L). For the reasons below, the loss amount is estimated to be $18,251,647.03, which is the total amount of the outstanding loan principal due to Emigrant Business Credit Corporation ("EBCC") as of the date of default, without reduction for the value of the collateral, the precise value of which is unascertainable. Interest due to EBCC under the terms of the Credit Agreements is not properly included in the loss calculation. *See id.* § 2B1.1, cmt. n.3(C).

WHEREAS, under § 2B1.1, "[l]oss is the greater of actual loss or intended loss." *Id.* § 2B1.1(b)(1) tbl. n.(A). Actual loss, which the Government contends is relevant here, is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1(b)(1) tbl. n.(C)(i). "A district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information."[1] *United States v. Rivernider*, 828 F.3d 91, 112 (2d Cir. 2016); *accord United States v. Jones*, No. 23-6113, 2024 WL 3371191, at *2 (2d Cir. July 11, 2024) (summary order), *cert. denied*, 145 S. Ct. 1453 (2025).

***EBCC Loss***

WHEREAS, the parties do not dispute that the outstanding loan principal due to EBCC as of the date of default is $18,251,647.03. However, Defendant argues that EBCC's loss is limited to the lesser amount that EBCC loaned against the fraudulently claimed collateral. This argument

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnote and citations are omitted, and all alterations are adopted.

is unavailing because Defendant defrauded EBCC, not only by pledging tax lien collateral that Ebury did not own, but also by misrepresenting and concealing that Ebury was not using a third-party custodian and servicer for an ever-increasing portion of its tax lien portfolio in contravention of the Credit Agreements. The preponderance of the evidence shows that, had Defendant not made the latter misrepresentation, EBCC would have placed Ebury in default -- which would have permitted EBCC to accelerate repayment of the outstanding loan balance and exercise rights against the collateral for any deficiency -- and not loaned Ebury any further amounts.

WHEREAS, in the Credit Agreements between Ebury and EBCC, Ebury represented that it "has complied in all respects with its obligations under the Custodial Agreement with respect to each tax lien." The Credit Agreements required Ebury's Custodial Agreement to be "in a form satisfactory to the Lender, pursuant to which the Tax Certificates and the other Tax Lien Documents will be delivered to the Custodian and held and administered in accordance with the terms of such agreement." The Credit Agreements contained a similar requirement for Ebury's Servicing Agreement.

WHEREAS, the Credit Agreements define an "Event of Default" to include when and if "any Servicer or Custodian agreement is terminated without being simultaneously replaced with a Servicer or Custodian, as applicable, agreement reasonably acceptable to the Lender." Upon an Event of Default, the Credit Agreements entitle EBCC to, among other things, "accelerate payment of the Note in full" or "exercise any rights against any Collateral."

WHEREAS, the preponderance of the evidence shows that EBCC would not have continued to loan money to Ebury and would have placed Ebury in default had Defendant disclosed that Ebury, beginning in 2018, was servicing and maintaining custody of

ever-increasing portions of its own tax lien portfolio without authorization, in contravention of Ebury's Credit Agreements with EBCC. Defendant falsely attested to EBCC that Ebury was continuing to use a third-party custodian and servicer for nearly its entire tax lien portfolio, as required by the Credit Agreements. Defendant actively concealed from EBCC Ebury's self-servicing and custody of tax liens. For instance, when EBCC asked Ebury for a "[c]ustodial report for the liens" in 2021, Mr. Hanratty sent EBCC a fabricated spreadsheet indicating that a third-party servicer had custody of liens that it did not.

WHEREAS, contrary to Defendant's argument that any misrepresentation was immaterial, EBCC's president testified that it was "critical" for a third party to have custody of the tax liens, which served as collateral for the EBCC loan. Jack Grady, who managed the relationship with Ebury on behalf of EBCC, testified that "[w]e wouldn't have done the transaction without a servicer present."

WHEREAS, the preponderance of the evidence shows that, had Defendant disclosed, and not misrepresented, that Ebury was self-servicing and keeping custody of an ever-increasing percentage of the tax lien collateral, EBCC would have placed Ebury in default -- which would have permitted EBCC to accelerate the loan or exercise rights against the collateral -- and not loaned any further amounts. Instead, EBCC continued to loan Ebury additional amounts until EBCC ultimately placed Ebury in default in November 2021. By that time, the outstanding principal amount exceeded $18 million, and a significant portion of EBCC's loan was purportedly secured by collateral that Ebury did not own. The outstanding principal owed to EBCC at the time of default is thus properly considered the loss amount.

WHEREAS, the loss amount ordinarily would be reduced to reflect the value of the collateral. *See* USSG § 2.B1.1 cmt. n.3(D)(ii). At the Court's request, the parties addressed this

4

issue. Based on these submissions, the Court finds that the precise value of the collateral is unascertainable. In any event, that value is not large enough to affect the Guidelines recommendation, which is unchanged as long as the loss amount is more than $9.5 million and less than or equal to $25 million. *See id.* § 2B1.1(b)(1)(K)-(L). That value also does not affect the sentence that the Court will impose. Thus, for purposes of the Guidelines calculation, the loss amount is $18,251,647.03, the outstanding loan principal due to EBCC as of the date of default.

WHEREAS, Defendant argues that EBCC's losses are attributable to the COVID-19 pandemic and other market factors, not Defendant's misrepresentations. This argument is unavailing. First, Defendant's vague assertion does not explain how, or the extent to which, market factors contributed to EBCC's inability to collect principal loaned to Ebury. Second, the record shows that Defendant submitted fraudulent borrowing base submissions as early as 2018, long before the COVID-19 pandemic began. Defendant is not entitled to a loss credit based on speculation that "in a gentler universe where the . . . market had gone up instead of down, [Defendant's] victims might have recovered their losses anyway." *United States v. Turk*, 626 F.3d 743, 749 (2d Cir. 2010). "No offset [is] warranted for losses resulting from changed economic circumstances because [EBCC] would not have been exposed to such risks had [Defendant] not fraudulently induced" EBCC to continue to loan Ebury funds in the first instance. *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) (summary order).

WHEREAS, Defendant argues that the loss amount is $0 because Ebury repaid EBCC over $9 million at the time that Ebury submitted the eight borrowing base submissions that the Government identified as fraudulent, but Ebury borrowed less than $9 million against those eight submissions (and less than $9 million against the fraudulently claimed collateral). This argument may have been persuasive if the only asserted fraud were Defendant's inclusion of tax liens that

5

Ebury did not own on borrowing base certificates, but the argument fails here because Defendant also misrepresented the extent of Ebury's use of a third-party custodian and servicer. To the extent Defendant argues that repayments during the course of the lending relationship should be credited against the outstanding principal, the record is unclear how much of Ebury's payment was for principal and how much for interest. Regardless, this argument is unavailing because, to the extent these repayments reduced the loan principal rather than the interest, those repayments are reflected in a reduced principal amount outstanding at the time of default.

### *Investor Losses*

WHEREAS, the Government argues that Ebury equity investors' losses are properly included in the loss amount. This argument is unavailing because the investors' losses are not a "reasonably foreseeable pecuniary harm" that resulted from Defendant's fraud. USSG § 2B1.1(b)(1)(C)(i). The Government argued, and the evidence showed, that the investors were largely the intended and actual beneficiaries of Defendant's fraud on EBCC.

WHEREAS, the Government argues that investors' losses were a reasonably foreseeable consequence of Defendant's fraud because Defendant misrepresented to investors that Ebury was using a third-party custodian and servicer. However, the record does not support the argument that these misrepresentations caused Ebury investors' losses. To the contrary, as the Government argued in summation, in 2018, Ebury investors "started demanding millions of dollars back from Ebury," and Defendant "lied to Emigrant" to induce EBCC to loan Ebury money so that Ebury could pay its investors. Trial Transcript, at 1760:16-1761:1.

WHEREAS, the Government argues that the investors' losses are properly included in the loss calculation because investors testified that, "had the defendant informed them that Ebury was not using an independent custodian, they would have requested the return of their investment

immediately because the custodian was supposed to be a check on potential fraud." This argument is unpersuasive because the investors' losses (in contrast to EBCC's loan loss) did not result from any fraud relating to Ebury's servicing and keeping custody of increasing portions of its tax lien portfolio. The investors' losses were not, for example, caused by Defendant's use of investor money for personal purposes, which a third-party custodian might have prevented. Instead, the evidence shows that Defendant caused Ebury to self-service and keep custody of its tax lien portfolio to conceal from EBCC that Ebury was claiming to own tax liens it did not -- for instance, by sending EBCC a fabricated spreadsheet indicating that a third-party servicer had custody of liens that it did not. The Government has not shown by a preponderance of the evidence that the investors' losses were a reasonably foreseeable consequence of Defendant's misrepresentations regarding the use of a third-party custodian and servicer. Investor losses are not properly included in the loss calculation.

**Acceptance of Responsibility Credit**

WHEREAS, the Court finds, based on its familiarity with the proceedings and review of the record, including the parties' sentencing submissions, that Defendant has not clearly demonstrated acceptance of responsibility for his offense. Defendant is thus ineligible for both a two-level offense level reduction pursuant to § 3E1.1(a) and a one-level offense level reduction pursuant to § 3E1.1(b).

WHEREAS, an adjustment under § 3E1.1:

is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve

7

issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG § 3E1.1 cmt. n.2. The "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility . . . [and] is entitled to great deference on review." *Id.* cmt. n.5. Here, Defendant put the Government to its burden of proof by denying the factual elements of guilt. Defendant was convicted following a jury trial and continues to contest factual guilt in post-trial motion practice. This case does not present a "rare situation" in which a defendant has clearly demonstrated an acceptance of responsibility despite asserting his trial rights. *See id.* cmt. n.2.

WHEREAS, Defendant's argument that § 3E1.1(b) violates the Sixth Amendment right to trial lacks merit. "[A] show of lenience to those who exhibit contrition -- e.g., by pleading guilty or paying upfront restitution -- does not carry a corollary that the Judge indulges a policy of penalizing those who elect not to accept responsibility." *United States v. DiMassa*, 117 F.4th 477, 485 (2d Cir. 2024).

**Offense Level Computation**

WHEREAS, except as discussed above, the following components of the Offense Level computation are undisputed and are explained in the Presentence Report:

- **Grouping:** Counts One, Two, Three and Four are grouped together pursuant to § 3D1.2(c);

- **Base Offense Level**: 7 pursuant to § 2B1.1(a)(1) and § 2S1.1(a)(1);

- Loss Amount Increase: A 20-level increase is added to the Base Offense Level since Defendant is responsible for a total loss of more than $9.5 million, but not more than $25 million, as discussed above, pursuant to § 2B1.1(b)(1)(K)-(L) and § 2S1.1(a)(1);

- Gross Receipts Increase: A 2-level increase is added to the Base Offense Level because

8

Defendant, through Ebury, "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," pursuant to § 2B1.1(b)(1)(17)(A);

- Specific Offense Characteristics Increase:  A 1-level increase is added to the Base Offense Level because Defendant was convicted under 18 U.S.C. § 1957 (for Counts Three and Four), pursuant to § 2S1.1(b)(2)(A);

- **Adjusted Offense Level** (Subtotal):  30.

- Acceptance of Responsibility:  No reduction for acceptance of responsibility is warranted for the reasons discussed above, under § 3E1.1;

- Zero-Point Offender Reduction:  A 2-level reduction is applied because the Court finds that Defendant has met the criteria set forth in § 4C1.1(a)(1)-(11) for certain zero-point offenders;

- **Total Offense Level**: 28.  It is hereby

    **ORDERED** that, for purposes of sentencing, the Total Offense Level under the

Guidelines is 28.

Dated:  May 23, 2026
      New York, New York

                                        LORNA G. SCHOFIELD
                                      **UNITED STATES DISTRICT JUDGE**